JACKSON, EXR., Appellant,

v.

STATE STREET BANK AND TRUST COMPANY, Appellee.

[Cite as *Jackson v. State Street Bank & Trust Co.* (1996), 110 Ohio App.3d 388.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15340.

Decided March 8, 1996.

Paul B. Roderer, Jr., for appellant.

Javitch, Block, Eisen & Rathbone, Hugh D. Berkson and Marc A. Melamed, for appellee.

FREDERICK N. YOUNG, Judge.

Juanita Jackson, the executor of the estate of Ella Kelley, appeals the trial court's decision granting State Street Bank and Trust Company's motion to dismiss.

## I

Ella Kelley resided in her home in Dayton along with her husband Henry Kelley and their in-home care provider Anita Rutledge. On August 8, 1991, Mr. Kelley died, leaving Mrs. Kelley a $10,000 Metropolitan Life Insurance Company ("Met Life") policy. Under the terms of the policy, Met Life opened a "Total Control Account" in Mrs. Kelley's name and deposited the $10,000 into that account. Furthermore, Met Life mailed blank checks/drafts to Mrs. Kelley with State Street's name listed on the checks/drafts as the drawee bank.

However, Ella Kelley never received her checks because her in-home care person removed the checks from Mrs. Kelley's mailbox. Between October 12, 1991 and October 24, 1991, Rutledge forged four of Mrs. Kelley's Met Life drafts and absconded with a total of $9,308. Rutledge has been prosecuted and found guilty of forging these drafts.

When Mrs. Kelley discovered that Rutledge had forged her checks, she immediately contacted Met Life. After a lengthy investigation, Met Life notified Mrs. Kelley that it had referred her claim to State Street Bank and Trust Co. ("State Street"). Met Life referred the claim to State Street because State Street is in charge of the Total Control Accounts pursuant to its agreement with Met Life. Under this agreement, State Street is required to provide data- and draft-processing services for the Total Control Account holders. State Street in its answer to interrogatories explained draft processing services as follows:

"A bank which performs draft processing services performs essentially the same functions as a bank on which a check is drawn. The difference is that a check is drawn against an account at the Bank and a draft is payable through the bank but the account on which it is drawn is maintained by another entity which is not a bank, in this case, an insurance company."

As part of these data- and draft-processing services, State Street is responsible for compiling balance statements and sending them to the account holders. More significantly, State Street is responsible for verifying the authenticity of the account holders' signatures, including Mrs. Kelley's, on their checks.

On August 5, 1993, Mrs. Kelley was notified that State Street had investigated her claim and denied her reimbursement. On April 25, 1994, State Street sent a letter to Mrs. Kelley explaining that it denied reimbursement because Mrs.

Kelley negligently gave access to her belongings to Rutledge, which substantially contributed to the making of the unauthorized signatures. As a result of State Street's refusal to pay the forgery claim, Mrs. Kelley commenced the present suit.

Mrs. Kelley began this action by filing a complaint in the Montgomery County Court of Common Pleas on June 24, 1994. Mrs. Kelley alleged that State Street wrongfully converted her personal property. However, Mrs. Kelley died while that action was being litigated and Juanita Jackson, her daughter, took over the litigation. Juanita Jackson was able to continue the litigation as the executor of the estate of Mrs. Kelley.

On August 26, 1994, State Street moved to quash service of process and to dismiss the matter for lack of personal jurisdiction. The trial court, on June 6, 1995, sustained State Street's motion to dismiss, finding that State Street did not contract to supply services in Ohio, that State Street did not transact business in Ohio, and that State Street did not supply services in Ohio. Based upon those findings, the trial court held that Jackson failed to establish long-arm jurisdiction and, consequently, that she lacked personal jurisdiction over State Street. Juanita Jackson now brings this timely appeal.

## II

### FIRST ASSIGNMENT OF ERROR

Jackson claims in her first assignment of error:

"The trial court erred in finding that the Ohio long-arm statute does not confer in personam jurisdiction over State Street Bank."

Ohio uses a two-part test to determine when it may exercise personal jurisdiction over a foreign defendant. *Goldstein v. Christiansen* (1994), 70 Ohio St.3d 232, 235, 638 N.E.2d 541, 543–544. First, the court must determine whether the state's long-arm statute and the applicable Civil Rule confer personal jurisdiction. Second, assuming the first step of the test has been satisfied, the court must consider whether granting jurisdiction would deprive the defendant of due process of law.

### LONG–ARM JURISDICTION

Ohio's long-arm statute, R.C. 2307.382, and its complementary provision in the Ohio Rules of Civil Procedure, Rule 4.3, provide:

"(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

"(1) Transacting any business in this state;

"(2) Contracting to supply services or goods in this state;

" * * *

"(4) Causing tortious injury in this state by an act or omission outside this state if he * * * engages in any * * * persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state[.]"

Since the long-arm provision is identical to the Civil Rule, we need only consider whether long-arm jurisdiction has been satisfied. After reviewing the long-arm statute, we hold that the trial court erred in finding that the statute does not confer personal jurisdiction over State Street. Specifically, we conclude that the trial court erred in finding that long-arm jurisdiction does not exist under the paragraph dealing with tortious injuries caused by an act or omission outside this state.

A determination of long-arm jurisdiction under R.C. 2307.382(A)(4) first entails a finding that the tortious injury occurred in Ohio. In the present case, Jackson alleges that State Street committed the tort of conversion. The basis of her claim is State Street's failure to verify the checks which Anita Rutledge forged and cashed in Ohio. As a result of State Street's failure to verify the checks, Jackson claims that Mrs. Kelley, an Ohio resident, lost nearly all of her insurance proceeds. These allegations, we hold, are sufficient to establish that the alleged tortious injury occurred in Ohio.

Next, long-arm jurisdiction requires a finding that the tortious injury was caused by an act or omission by the defendant outside this state. In this case, Jackson alleges that State Street's failure to verify the signature as it was processed in Massachusetts was the omission which caused Mrs. Kelley's money to be converted. This allegation, we also conclude, is sufficient to establish that an alleged omission was committed outside Ohio by State Street.

Finally, long-arm jurisdiction requires that there be a showing of one of the following: that the defendant regularly does or solicits business, that the defendant engages in any other persistent course of conduct, or that the defendant derives substantial revenue from goods used or consumed or services rendered in this state. We find that State Street is amenable to Ohio jurisdiction under the "engages in any other persistent course of conduct" requirement. Ohio case law holds that "persistent course of conduct" means any conduct that is continuous and not just sporadic. Furthermore, that phrase contemplates a quality of contacts in Ohio different from those involved in doing business in Ohio. *Busch v. Serv. Plastics, Inc.* (N.D.Ohio 1966), 261 F.Supp. 136, 141. "Thus a regular doing or soliciting of business would be proved by a showing that the nonresident or foreign corporation maintained an office in Ohio or employed a

sales or service force in Ohio. On the other hand, proof of a persistent course of conduct might be satisfied by a showing that the nonresident foreign corporation continuously and not sporadically relied on and benefited from one or more independent sales or services representatives operating in Ohio." *Id.*

■ We conclude that State Street has a persistent course of conduct with Ohio. State Street has a continuing agreement with Met Life to perform data- and draft-processing services for its Total Control Account holders, including the five to eight thousand Ohio account holders at the time of this action, and any future Ohio account holders. As part of these data- and draft-processing services, State Street clears thousands of checks cashed in Ohio, as well as verifies the signatures on those checks. State Street also sends the Ohio account holders monthly balance statements. Additionally, Met Life refers claims concerning these accounts to State Street and State Street in turn corresponds with these residents.[1] We hold that these actions benefit State Street and that they amount to a persistent course of conduct.

■ It is noteworthy that we also find State Street amenable to Ohio jurisdiction under the "derives substantial revenue from * * * services rendered in this state" requirement. A determination of jurisdiction under that section first entails a consideration of whether services were performed in Ohio. We find that the physical location of a bank does not control the situs of its services. We adopt the analysis of the court in *Sanders v. State Street Bank & Trust Co.* (S.D.Tex.1993), 813 F.Supp. 529, 533, on this issue. Coincidentally, State Street was also the defendant in that case.

The cause of action in *Sanders* arose out of the alleged mishandling of an employee savings plan which State Street administered for the Amoco Corporation. State Street administered this plan for Amoco employees nationwide. In fact, less than a third of the plan participants were located in Texas. As part of its administration of the savings plan, State Street set up a telephonic system for the employees to make their account transactions. The telephone system was available to plan participants nationwide.

The alleged problems with State Street's administration of these accounts began when the price of the Amoco stock fell. At that time, the employees who had invested their savings plan funds in Amoco stock wanted to reinvest their money. However, State Street allegedly assigned only six operators to handle telephonic transactions. Apparently, many plan participants were unable to get through to the operators and consequently suffered a substantial decrease in the

---

1. Met Life referred Mrs. Kelley's claim to State Street, and State Street corresponded several times with Mrs. Kelley with regard to the forgeries made on her Total Control Account.

value of their savings plans. Subsequently, the employee participants in Texas brought an action against State Street.

The court held that Texas had jurisdiction over State Street even though State Street conducted its entire operation in Massachusetts. The court explained:

"State Street administers the savings plans of over 10,000 individuals who reside in this state. These individuals earn the money that they contribute to their savings plans in this state and any transaction altering the orientation of their investments are, *from their perspective,* made within this state as well. *While State Street may conduct its entire operation in Massachusetts, the unvarnished fact is that any action that it takes with regard to the savings plan has a real and important effect in Texas.* It is not unreasonable to presume that State Street foresaw this fact and the fact that if any problems occurred with the plan that it would be called to account in the forum where huge numbers of aggrieved plan participants reside." (Emphasis added.) *Id.* at 532.

Likewise, we find that although State Street performed its entire operation in Massachusetts, from the perspective of the five to eight thousand Ohio residents, those services were performed in Ohio. The five to eight thousand Ohio residents own the funds in these accounts and use them to purchase goods in Ohio. Furthermore, the account holders cash these checks in Ohio and receive monthly balance statements in Ohio. Finally, State Street's actions or omissions regarding these five to eight thousand accounts are felt in Ohio and have an important effect in Ohio. Thus, we find for purposes of long-arm jurisdiction that State Street performed services in Ohio.

Our determination that State Street performed services in Ohio is also supported by *Gold Circle Stores v. Chem. Bank–Dommerich Div.* (1982), 4 Ohio App.3d 10, 4 OBR 31, 446 N.E.2d 194. In *Gold Circle,* the court was called upon to determine whether a defendant which never actually transacted business in Ohio could be subject to personal jurisdiction. In particular, the court considered whether the purchase of Ohio accounts receivable in an out-of-state transaction and from an out-of-state corporation was sufficient to meet the "transacting business in this state" long-arm requirement. The court held that it was. The court determined that although the defendant did not actually transact business in Ohio, the defendant was so involved with the underlying accounts—for example, it had the rights to receive the purchase price for the merchandise sold in Ohio—that the defendant could be deemed to have been transacting business in Ohio. Likewise, we find that although State Street conducted its operations in Massachusetts, State Street through its data- and draft-processing agreement was so involved with the Ohio insurance accounts that it could be deemed as having provided services in this state.

■ Next, we must consider whether State Street derives substantial revenue from performing the data- and draft-processing services for Ohio Total Control Account holders. Ohio courts have a great deal of flexibility and latitude in determining what constitutes "substantial revenue." *Mead Corp. v. Allendale Mut. Ins. Co.* (N.D.Ohio 1979), 465 F.Supp. 355, 360. "The meaning of the word substantial 'is to be gauged by all the circumstances surrounding the transaction with respect to which it has been used.'" *Busch, supra,* 261 F.Supp. at 142, quoting 83 Corpus Juris Secondum (1953), Substantial, at 762. Furthermore, "substantial revenue" is not the equivalent of the term "profit."

■ We find that State Street derives substantial revenue from services to Ohio residents. Even though we were not presented with an actual figure, we conclude that the revenue from performing services for five to eight thousand account holders cannot be insubstantial. Consequently, we find that State Street is amenable to jurisdiction under Ohio's long-arm statute.

Before we move on to the issue of due process, we note that this case is distinguishable from cases that hold that check-processing services alone do not satisfy the requirements of long-arm jurisdiction. *Sears Bank & Trust Co. v. Luckman* (1978), 61 Ill.App.3d 260, 18 Ill.Dec. 520, 377 N.E.2d 1156; *Jack O'Donnell Chevrolet, Inc. v. Shankles* (N.D.Ill.1967), 276 F.Supp. 998; *State ex rel. Bank of Gering v. Schoenlaub* (Mo.1976), 540 S.W.2d 31. Those cases concerned plaintiffs who deposited checks given to them by their debtors. The plaintiffs alleged that they suffered injuries because the debtors' drawee banks, and in some cases the transferring banks, did not dishonor the checks in a timely manner.

In *Sears,* for example, the Sears Bank, an Illinois banking corporation, received a check from one of its debtors, a California citizen, drawn on a Los Angeles bank account. The check was issued to discharge an alleged indebtedness due Sears Bank. Sears deposited the check in an Illinois bank which forwarded the check to a bank in San Francisco, which in turn forwarded the check to the Federal Reserve Bank in San Francisco. The Federal Reserve Bank then sent the check to the Los Angeles bank. The Los Angeles bank dishonored the check. However, this process took over a month and, believing that the check had been honored, Sears discharged the debt.

Sears brought an action in Illinois against the San Francisco Federal Reserve Bank and the Los Angeles bank for mishandling the check. The Illinois court dismissed the case for lack of personal jurisdiction, holding:

" 'Checks often follow circuitous routes during the clearing process, and in view of the contractual obligations which the various banks make during the chain, it would be unwise policy to hold a bank subject to the jurisdiction of any foreign

state regardless of how fortuitous the bank's contact therewith, merely because the bank happens to conduct a business with certain interstate ramifications.' " *Id.*, 61 Ill.App.3d at 265, 18 Ill.Dec. at 523, 377 N.E.2d at 1159, quoting *Jack O'Donnell, supra,* 276 F.Supp. at 1004.

While we agree that a bank processing a check is not amenable to the jurisdiction of every state where the recipient of one of its customer's checks resides, we do not find that this reasoning applies in the present case. The Ohio residents in these cases are different. In the present case, the plaintiff has an account with State Street and is not just a recipient of a check drawn on a State Street account. Additionally, State Street is not a bank in the circuitous route of check processing. State Street purposefully and voluntarily agreed to provide services to these account holders, unlike the check-processing cases where the plaintiff comes into contact with the bank by happenstance.

## III

### SECOND ASSIGNMENT OF ERROR

Next, we must consider whether granting jurisdiction would deprive State Street of due process of law. Jackson, in her second assignment of error, claims:

"Due process permits Ohio's exercise of in personam jurisdiction over State Street Bank; fundamental fairness requires Ohio's exercise of in personam jurisdiction."

The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid judgment against a nonresident. *Kulko v. California Superior Court* (1978), 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132, 140. A judgment that does not comply with due process is void and is not entitled to full faith and credit. *Pennoyer v. Neff* (1878), 95 U.S. 714, 24 L.Ed. 565. To determine whether due process allows jurisdiction in the present case, we will review several significant cases on due process requirements.

### A

### DUE PROCESS

*Internatl. Shoe Co. v. Washington* (1945), 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, marked the first expansion of personal jurisdiction and set forth the basis of the modern due process requirements. In *International Shoe*, the court held that personal jurisdiction may be exercised over a nonresident defendant as long as the defendant has sufficient "minimum contacts" with the forum so that the maintenance of the suit will not offend "traditional notions of fair play and substantial justice." *Id.* at 316, 66 S.Ct. at 158, 90 L.Ed. at 102. The *Interna-*

*tional Shoe* "minimum contacts" test marked an abandonment of the *Pennoyer v. Neff* absolute sovereignty jurisdictional framework. Under *Pennoyer*, personal jurisdiction was grounded on a state's power over the defendant's person. Hence, the defendant's presence within the territorial jurisdiction was a prerequisite to the court rendering a judgment binding on the defendant. After *International Shoe*, a nonresident defendant could be subject to personal jurisdiction as long as the defendant had certain minimum contacts with the forum.

The Supreme Court further expanded the reach of personal jurisdiction in *McGee v. Internatl. Life Ins. Co.* (1957), 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223. *McGee* concerned a California state court's exercise of personal jurisdiction over a Texas insurance company. The insurance company's only contact with the state was one insurance contract which it assumed from an Arizona insurance company. The court upheld the exercise of jurisdiction, recognizing that modern technology has made it easier to conduct business across state lines and that advances in transportation have made it less burdensome to defend out-of-state suits. The court wrote:

"Since *Pennoyer v. Neff* this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations.

"Looking back over this long history of litigation a trend is clearly discernable toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." 355 U.S. at 222–223, 78 S.Ct. at 200–201, 2 L.Ed.2d at 225–226.

The court found that minimum contacts were satisfied because the *insurance contract* had substantial connections with the state. Those connections were that the premiums statements were mailed to the state, that the insured was a resident of the state, and that the contract was delivered to the state.

Many courts understood *McGee* as allowing an almost limitless expansion of personal jurisdiction. Consequently, a year later in *Hanson v. Denckla* (1958), 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, the Supreme Court attempted to qualify its holding in *McGee*. The court stated:

"As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of *Pennoyer v. Neff* * * *, to the flexible standard of *International Shoe Co. v. State of Washington* * * *. *But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of the state courts.* [Citation omitted.] Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him." (Emphasis added.) 357 U.S. at 250–251, 78 S.Ct. at 1238, 2 L.Ed.2d at 1296.

The court further qualified *McGee* by emphasizing that there must "be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" to justify the exercise of long-arm jurisdiction. *Id.* at 253, 78 S.Ct. at 1240, 2 L.Ed.2d at 1298.

However, even after *Hanson,* lower courts failed to restrict their grants of long-arm jurisdiction. Therefore, the Supreme Court in *World–Wide Volks-wagen Corp. v. Woodson* (1980), 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490, again attempted to reverse the trend of apparently limitless long-arm jurisdiction. To do this the court explained that due process restrictions on personal jurisdiction are necessary elements of state sovereignty. The court elucidated:

"The limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years. As we noted in *McGee v. International Life Ins. Co.* * * *, this trend is largely attributable to a fundamental transformation in the American economy * * *. The historical developments noted in *McGee*, of course, have only accelerated in the generation since that case was decided.

"Nevertheless, we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution. The economic interdependence of the States was foreseen and desired by the Framers. In the Commerce Clause, they provided that the Nation was to be a common market, a 'free trade unit' in which the States are debarred from acting as separable economic entities. [Citation omitted.] But the Framers also intended that the

States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment.

"Hence, even while abandoning the shibboleth that '[t]he authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established,' *Pennoyer v. Neff* * * *, we emphasized that the reasonableness of asserting jurisdiction over the defendant must be assessed 'in the context of our federal system of government,' *International Shoe Co. v. Washington* * * *, and stressed that the Due Process Clause ensures not only fairness, but also the 'orderly administration of the laws.' [Citation omitted.]" 444 U.S. at 292–294, 100 S.Ct. at 565, 62 L.Ed.2d at 498–499.

After stressing that minimum contacts are still required, the court clarified the due process requirements by compiling them into two categories: (1) those which protect the defendant against the burdens of litigating in a distant inconvenient forum, and (2) those which ensure that the states through their courts do not overreach their constitutional limits.

The court held that the first category entails a balancing of the inconvenience to the defendant against the forum state's interest in the suit, the plaintiff's interest in litigating in a particular forum, the state's interest in efficiently resolving controversies, and the several states' interest in furthering the goals of social policy. The court noted that while the burden on the defendant is always the primary concern in this category, it is necessary for the courts to keep in mind that " 'modern transportation and communication have made it much less burdensome for a[n] [out-of-state] party sued to defend himself in a State.' " *Id.*, 444 U.S. at 293, 100 S.Ct. at 565, 62 L.Ed.2d at 498. The second category, the court held, entails the following determinations: the extent of the defendant's activities in the forum state and their relation to the cause of action, whether the defendant reasonably should have anticipated being hailed into the forum state's courts, and whether the defendant purposefully availed itself of the benefits and protections of the forum state.

The most recent pronouncement of the due process standard was set forth in *Burger King Corp. v. Rudzewicz* (1985), 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528. *Burger King* used a two-part test to determine whether due process allows the exercise of jurisdiction. The first part of the test is whether the defendant has minimum contacts with the state. In this part of the test, the courts are to consider whether the defendant purposefully availed itself of the benefits and protection of the forum state and whether the cause of action arose out of those purposefully availing activities. The *Burger King* court held that this standard

may be satisfied even though the defendant never physically entered the forum state. The key in the analysis, the court held, is whether the defendant *purposefully directed* his activities toward the forum state, not whether the defendant entered the forum state.

In the second part of the test, the defendant's minimum contacts must be "considered in light of other factors to determine whether the assertion of personal jurisdiction [will] comport with 'fair play and substantial justice.'" *Id.*, 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543. In order to make this determination, the courts are to consider:

1. "the burden on the defendant";

2. "the forum's * * * interest in adjudicating the dispute";

3. "the plaintiff's interest in obtaining convenient and effective relief";

4. "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and,

5. "the shared interest of the several states in furthering * * * substantive social policies." *Id.*, 471 U.S. at 477, 105 S.Ct. at 2184, 85 L.Ed.2d at 543.

The *Burger King* court held that "[t]hese considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*, citing *Keeton v. Hustler Magazine, Inc.* (1984), 465 U.S. 770, 780, 104 S.Ct. 1473, 1481, 79 L.Ed.2d 790, 801. On the other hand, the court found that where the defendant has been shown to have purposefully directed its activities toward the forum state, the defendant must present a compelling case that the presence of other considerations would render jurisdiction unreasonable. However, most of those considerations, the court noted, may be accommodated through means other than finding jurisdiction unconstitutional.

## B

## ANALYSIS

These cases demonstrate the evolution of the due process standard. Due process has evolved from a jurisdictional framework that each state's sovereignty over its persons and property is absolute, to a jurisdictional framework which allows a state to reach nonresidents who have minimum contacts with the state. Due process has continued to evolve within the minimum contacts standard. The courts may now take into account modern business realities and advancements in travel in considering whether due process is satisfied. Nevertheless, courts have been cautioned that "minimum contacts" does not allow the limitless exercise of personal jurisdiction. State sovereignty, a concept embedded in our Constitution

and the Fourteenth Amendment, should also be considered as an important limitation on the extension of personal jurisdiction. With these considerations in mind, we will begin addressing whether due process has been satisfied in the present case.

1

MINIMUM CONTACTS

■ We find that Jackson has sufficiently established that State Street has minimum contacts with Ohio. The court in *Burger King* held that "minimum contacts" means more than " 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.*, 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542. Furthermore, the court found that the defendant has significant contacts with the state when the defendant has created a "continuing obligation" between himself and residents of the forum.

In the present case, State Street has a continuing obligation to provide data- and draft-processing services for thousands of Ohio Met Life account holders. Furthermore, State Street provides similar services to several other Ohio life insurance companies. As part of these services, State Street clears thousands of checks cashed in Ohio as well as verifies the signatures on those checks. State Street also sends, or causes to be sent, monthly balance statements to the Ohio account holders. Additionally, Met Life refers claims concerning these services to State Street, and State Street in turn corresponds with the account holders. We find this sufficient to establish that State Street has minimum contacts with Ohio.

■ Furthermore, we find that these contacts are sufficient, even though State Street was not physically present in Ohio. As we stated earlier, the test for personal jurisdiction is whether the defendant purposefully directed activities at the forum state, not whether the defendant was physically present in the state. *Burger King, supra,* 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543 (finding "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted"). We hold that the defendant purposefully directed its activities at Ohio by voluntarily and purposefully agreeing to provide services to Met Life's Total Control Account holders, including the five to eight thousand Ohio residents.

■ Additionally, we find that this cause of action directly arose out of the services State Street agreed to provide to these account holders. State Street has a continual obligation to verify check signatures and to bear the risk of loss in

the case of wrongful payment on a forged check. Jackson alleges that State Street failed to perform these services, causing her mother to lose nearly all of her insurance proceeds. Thus, we find that the cause of action arose directly out of State Street's purposefully availing activities.

We also find that State Street has availed itself of the benefits and protections of Ohio laws as a result of its agreement with Met Life. Under Ohio law, the payor bank makes certain guarantees or warranties to transferring banks, or if there are none, the drawee bank. Included in those guarantees is that the signature on the cashed check is valid. If those warranties have been breached, State Street has the right to sue the payor bank in Ohio courts and under Ohio law to recover the amount payed out in the forged checks.

*Jack O'Donnell Chevrolet, Inc. v. Shankles, supra,* found that the defendant purposefully availed itself of the benefits and protections of the forum state on similar grounds. The defendant in that case was also an out-of-state bank. The plaintiff alleged that the bank did not dishonor the checks in a timely manner, causing the plaintiff to suffer a loss. The court found:

"[T]he Fort Payne Bank [the out-of-state defendant] had available to it the benefit and protection of Illinois law. To be specific, under Section 4–207 of the Illinois Uniform Commercial Code, Ill.Rev.Stat.1965, c. 26, * * * the Mutual Bank of Chicago as the depository bank made certain warranties to the Fort Payne Bank. Had those warranties been breached, it is conceivable that the Fort Payne Bank could sue therefor in the Illinois courts under the aforementioned Illinois law." *Id.,* 276 F.Supp. at 1003.

We agree with the analysis in that case and, for the same reason, hold that State Street availed itself of Ohio's benefits and protections.

Finally, we find it incredible that State Street did not foresee being haled into court in Ohio as a result of its obligations to Ohio residents. The administration of these accounts has a real and important effect on thousands of Ohio residents. Furthermore, State Street earns a substantial amount of money providing services for these accounts. We find that it is not unreasonable to assume that an out-of-state bank that contracts to provide accounts and services for thousands of residents of a particular state would foresee being haled into that state concerning its actions directly affecting those accounts.

2

## FAIR PLAY AND SUBSTANTIAL JUSTICE

The factors to be considered under the fair play and substantial justice test include (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and

effective relief, (4) the interstate judicial system's interest in obtaining the most effective resolution of controversies, and (5) the shared interests of several states in furthering fundamental substantive social policies. *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano Cty.* (1987), 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92, 105. However, as we noted earlier, it is rare that the fair play and substantial justice analysis will not be met when it has been established that the defendant has minimum contacts with the forum state. In fact, once it has been determined that the defendant has minimum contacts, the defendant will have to present a compelling case that jurisdiction is unreasonable.

■ We find that State Street has not demonstrated that jurisdiction is unreasonable. First, we are not convinced that State Street will be excessively burdened by trying this case in Ohio. State Street argues that trying the case in Ohio would be burdensome because its representatives will have to travel to Ohio. While we acknowledge that State Street will suffer some burden, we find that many of the witnesses necessary to the action, including the payor bank, are already present in this state. In fact, State Street has indicated that its defense to this suit is that Mrs. Kelley negligently contributed to the forging of the checks by allowing her in-home care provider access to her mail. To present this defense, State Street will inevitably need to call Ohio residents as witnesses.

The Supreme Court in *McGee, supra,* found that the location of the witnesses is important in determining whether the defendant will be unduly burdened by trying the case in another state. The court indicated that the presence of crucial witnesses in the forum state weighs in favor of finding that the defendant is not overly burdened. Moreover, the court noted that in insurance cases, the crucial witnesses will often be found in the insured's locality.

■ We also find that Ohio has a significant interest in adjudicating this dispute. The Supreme Court in *McGee* found that California had a significant interest in adjudicating one of its resident's claims for the following reasons:

"It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable. When claims were small or moderate individual claimants frequently could not afford the cost of bringing an action in a foreign forum—this in effect making the company judgment proof." 355 U.S. at 223, 78 S.Ct. at 201, 2 L.Ed.2d at 226.

Similarly, the Supreme Court in *Burger King, supra* 471 U.S. at 478, 105 S.Ct. at 2185, 85 L.Ed.2d at 544, held that "jurisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a

party unfairly is at a 'severe disadvantage' in comparison to his opponent" (citing *The Bremen v. Zapata Off–Shore Co.* [1972], 407 U.S. 1, 18, 92 S.Ct. 1907, 1917, 32 L.Ed.2d 513, 525). Moreover, the court held that "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Id.,* 471 U.S. at 474, 105 S.Ct. at 2183, 85 L.Ed.2d at 541.

We find that Ohio has a significant interest in ensuring that its residents have an effective means of seeking justice. If Ohio courts would decline to exercise jurisdiction, the thousands of Ohio residents which State Street services could in effect be without recourse against State Street for any wrongdoing. Many of the Ohio residents, like Mrs. Kelley, may be beneficiaries of small insurance policies. For these individuals, as for Mrs. Kelley, it may not be financially feasible to maintain suits in Massachusetts to recover from State Street. Thus, State Street would in effect be rendered judgment-proof.

■ The plaintiff, Jackson, also has a strong interest in obtaining relief in Ohio. The amount to be recovered in this suit, a little over $9,000, is relatively small. Even if Jackson could eventually recover the stolen proceeds, the expense of having to maintain her suit in Massachusetts would likely cost her all of the proceeds.

■ Next, we find that the interstate judicial system's interest in obtaining the most efficient resolution of controversy requires Ohio to exercise personal jurisdiction in this case. Many of the witnesses reside in Ohio. Even the payor bank, which State Street will likely want to join in this action for indemnification purposes, is located in Ohio. Thus, we find that Ohio is the most convenient and efficient forum for the resolution of this dispute.

■ Finally, we find that the shared interest of the several states favors the resolution of this issue in Ohio. The several states have an interest in ensuring that controversies are resolved. As previously mentioned, if Ohio does not exercise jurisdiction, Jackson will not have a viable remedy against State Street. Therefore, allowing the suit to be maintained in Ohio will advance the important social policy of ensuring that individuals have an adequate forum to resolve controversies.

Based upon the foregoing, we uphold both assignments of error and reverse the trial court's decision. We remand this action to the trial court to be heard on its merits.

*Judgment reversed*
*and cause remanded.*

Brogan and Wolff, JJ., concur.